DUFF, ADMR., APPELLEE, *v.* CORN, APPELLANT.

(No. 756—Decided January 30, 1947.)

*Messrs. Peyton & Winters* and *Messrs. Pratt & Crowe,* for appellee.

*Mr. A. J. Layne,* for appellant.

METCALF, P. J.  The plaintiff, G. M. Duff, as administrator of the estate of Golden E. Estep, deceased, brought suit in the Court of Common Pleas of Lawrence county against the defendant, D. E. Corn, for damages for wrongful death of his decedent, and, because of the nature of the errors complained of as hereinafter set out, we here quote the material allegations of the amended petition.

"Plaintiff says that the defendant at the time here-inafter mentioned was the owner and operator of a nite club in Ironton, Ohio, then known as the 'Ritzy Ray' but now known as the 'Riviera,' wherein beer and intoxicating liquor were dispensed; that said establishment remained open for business late at night and large crowds congregated therein, and that the defendant in furtherance of his plan to control the patrons of his establishment and to prevent damage to his property employed to assist him one, Willard Mays, causing the said Willard Mays to be armed with a pistol and a blackjack and authorized said Willard Mays to use said weapons and such force as he deemed necessary in furtherance of defendant's business.

"Plaintiff says that on Sunday, October 28, 1945, shortly after midnight his decedent went to the Ritzy Ray to get his wife, who was a patron in said establishment; that when the said Estep attempted to remove his wife from said establishment the said Willard Mays, agent of the defendant and acting within the scope of his employment, grabbed the said Estep and violently jerked him away from his wife and ordered him to leave the premises. Plaintiff says that in compliance with said order Golden E. Estep, the decedent, walked away from said establishment across the parking lot and the adjoining sidewalk to Third street; that as said Estep started to cross Third street the said Willard Mays, agent and employee of the defendant, as aforesaid, wrongfully fired a pistol into the lower part of decedent's back causing him to fall to the street.

"Whereupon said Mays came into the street, picked up the said Estep by the hair of the head, cursed him, shook him violently and kicked him in the body, thereby inflicting wounds and injuries which caused the

death of the said Golden E. Estep on November 3, 1945, all to plaintiff's damage in the sum of $50,000. Plaintiff says that all of said acts of said Willard Mays, above complained of, were done and performed in furtherance of said established plan of the defendant, D. E. Corn, to control the patrons of his establishment."

The defendant filed an answer which in substance admits the killing and sets up three separate defenses: First, that Mays was at the time of the shooting of the decedent a duly appointed deputy sheriff and acting as such; second, that Mays was acting in self-defense; and third, that the defendant was not at his place of business at the time the decedent was shot and did not know of the occurrence until sometime thereafter.

The reply of plaintiff admits that Mays was at the time a duly authorized deputy sheriff but denies that Mays was engaged in the discharge of official duties at the time he inflicted the fatal injuries.

On the issues so joined the trial was had before a jury, which resulted in a verdict in favor of the plaintiff in the sum of $7,500, from which verdict and judgment thereon the defendant appeals on questions of law.

There are four separate assignments of error in the following language:

"The trial court erred in refusing to render judgment for defendant upon his motions for judgment:

"1—Upon the pleadings; and

"2—Upon the pleadings and statement for plaintiff; and

"3—Upon the pleadings and evidence, at close of plaintiff's evidence when plaintiff rested and at close of all the evidence; and

"4—Upon the pleadings and the special findings of the jury in answer to interrogatories, *non obstante veredicto*."

It is the defendant's contention as evidenced by those assignments of error that the question of whether Willard Mays, at the time of the matters complained of, was acting as a public officer in the discharge of a public duty or as the agent of the defendant or in the dual capacity of both was one of law and not of fact for the jury.

The record discloses that the defendant was the owner and operator of a night club in the city of Ironton, Ohio, where beer and liquors were dispensed and served on the premises and where large crowds congregated, and that the defendant employed at least three men to keep order in and about the club, to prevent trouble and disturbances and to prevent minors from frequenting the place.

As one of those men, defendant employed Willard Mays on or about July 13, 1945; and the defendant caused Mays to be appointed a deputy sheriff in early August of the same year. The defendant signed Mays' bond as such officer and retained him in his employ and continued to pay him $220 per month up to and including the time complained of in the amended petition.

The defendant testified under cross-examination:

"A. When he [meaning Mays] first came to work I give him his orders, told him what to do.

"Q. Now then, what were those orders? A. Those orders at that time were to—if any trouble developed, or anything like that, to take care of it the best he could, and to prevent minors being in the place.

"Q. And what else did you tell him to do? A. And to take care of anything that might be of our line, that wouldn't be right in a place of business, anybody fussing, quarreling anything like that come up to eliminate it the best he could."

Although the defendant continued to pay Mays' salary at the same rate after he was appointed deputy sheriff, and although the record discloses that Mays' duties did not change, the defendant maintains that after this appointment he gave Mays no orders.

At the time complained of in plaintiff's amended petition, plaintiff's decedent went to this night club in a taxi at or about midnight on Saturday night looking for his wife whom he found therein seated at a table with another girl. The evidence is in conflict as to just what occurred at this table but it is clear that the decedent attempted to have his wife leave the club and go home with him. The wife ran outside the building and around to another entrance in order to return to the club. The decedent crossed through another part of the club and met her as she approached this second entrance and again the testimony is conflicting as to what transpired but all agree that the decedent was remonstrating with his wife attempting to prevent her from re-entering the club. Mays, observing the decedent hurriedly coming through the club to this entrance, which entrance entered into a small vestibule where Mays was stationed, and further observing the decedent in his attempt to prevent his wife from re-entering, interceded. The evidence is clear that the decedent informed Mays that the lady he was trying to prevent from entering the club was decedent's wife. As to what transpired at this time the wife testifies:

"Q. Now, what happened next when you met your husband there in that doorway? A. I had taken about two steps in the doorway and I met him and he started to shove me toward the door outside, and said I wasn't going in there.

"Q. What next happened? A. About that time why

someone grabbed him, I didn't know who it was, grabbed him and Golden said 'That's my wife,' and he said 'I don't give a damn who it is,' and that was the last I seen, he had Golden's coat turned up over his head and I went on to the ladies rest room, that's all I seen of it."

The testimony of Mays at that point is in conflict with that of the wife of decedent in that he claims that the decedent was striking his wife and that he threw his wife through the door. There is a further conflict as to what took place following this incident, that is, whether the decedent had Mays down as a result of their tussle or scrap, but one thing is clear that the decedent was on his way back to the taxi and had reached the vicinity of the curb of the street when Mays shot him in the back, from which wound the decedent died.

In determining the question as to whether Mays was acting as a public official in the discharge of a public duty when he shot the decedent or whether he was acting as an employee and agent of the defendant and in the course of his employment or in the dual capacity of both such officer and agent, we are guided by certain definite rules of law that are universal throughout the various jurisdictions of the United States, where this question has been presented. In 18 Ruling Case Law, 786, Section 246, it is said:

"The weight of modern opinion * * * is that where private persons, with the consent of the state, employ its police officers to represent them, and to do special work for them in protecting and preserving their property and maintaining order on their premises, and such officers are engaged in the performance of their duties to their employers, and are acting within the scope of their powers and duties, they become and are the servants and employees of such private persons, and that

for negligent and wanton acts committed by them in the line of their duty, and when engaged in the performance of such duties, to the injury of others, their masters or employers are liable.''

Whether these officers are at the time and place protecting and preserving the property of their employers and maintaining order on their employers' premises and otherwise engaged in the performance of their duties to their employers within the scope of their employment is universally held to be a question of fact for the determination of the jury. See *Sharp* v. *Erie Rd. Co.*, 184 N. Y., 100, 76 N. E., 923.

That rule is deviated from only in a case where it so clearly appears that the officer was acting only in his capacity as an officer or beyond the limits of any express or implied authority derived from or of any duty owed to the employer that no conclusion, other than that the officer was not acting in his capacity as an employee, could reasonably be drawn. In such instance it becomes a question of law because there is no issue for the jury. 8 L. R. A., 846; 23 L. R. A. (N. S.), 289, note; *Penna. Rd. Co.* v. *Kelly,* 177 F., 189, 30 L. R. A. (N. S.), 481.

In 55 A. L. R., 1201, annotation, in quoting from *Kusnir* v. *Pressed Steel Car Co.* (D. C.), 201 F., 146, it is stated:

''Employers cannot escape responsibility for the grossly negligent, wanton, and wilful acts of persons employed by them, and representing them, and paid by them, by employing constables, marshals, sheriffs, and peace officers of the state, provided such grossly negligent, wilful, wanton, and wrongful acts are done by such representatives where and while acting within the general scope of the authority conferred on them. To establish a rule to the contrary would lead to the grossest acts of infamy and outrage, and de-

stroy, as it ought, respect of government and courts. The state would not be liable for such acts, and if the employer—that is, the master, who makes the officer his representative for his private purposes—is not, because the wrongdoer is a police officer, such officer may perform the work he is employed to do in the most grossly careless, wanton, and wilful manner, fraught with great peril to others, and the injured party must look to the wrongdoer, usually of no pecuniary responsibility, and not the employer, who employed the wrongdoer to do the very acts complained of, but not in a wanton, wilful, and negligent manner, a mode fraught with peril to others. Of course, the employee must be acting in the line of his duty to his master, and within the general scope of his authority, and represent him in that matter.''

As to the question of whether the employee is acting in the line of his duty and within the general scope of his authority, that same annotation reads, at page 1205:

''It may be stated as a general proposition that, where the capacity in which the person acts when occupying the dual position of public officer and private employee is uncertain, and dependent upon conflicting testimony and inconclusive facts and circumstances, the question whether he was at the time acting in the course of his employment for the private employer or whether he was acting in his public capacity as an officer is for the jury.''

The Supreme Court of Ohio, in line with other jurisdictions, has established the principle that such a question as that presented in the instant case as to whether Mays was acting in his official capacity and performing a public duty or acting in his capacity as an employee of the defendant and in the course of such employment

is a question of fact to be determined by the jury under appropriate instructions. In *Penna. Rd. Co.* v. *Deal,* 116 Ohio St., 408, at page 414, 156 N. E., 502, the Supreme Court quoted with approval 7 Labatt's Master and Servant (2 Ed.), Section 2477, where the author, after discussing the liability of the master for the torts of a servant employed as a public policeman, uses this language:

"In every instance, therefore, the liability of the defendant is a question of fact, to be determined by the jury under appropriate instructions."

We agree with counsel for defendant that the Supreme Court of Ohio was not endeavoring to say that in every case this question is one of fact for the jury because as hereinabove shown the evidence may be so clear and conclusive as to make it a question of law, but we do maintain that so far as the situation presented in this appeal is concerned it brings it within the rule enunciated in the *Deal case, supra.*

In *Republic Steel Corp.* v. *Sontag,* 21 Ohio Law Abs., 358, the Court of Appeals of the Seventh Appellate District followed the same rule when it held in the third paragraph of the syllabus that:

"A deputy sheriff paid by a private corporation as a policeman to protect its plant, who exercised no official functions outside of the plant property, and whose immediate superior was a lieutenant in the plant police force, who with the knowledge of the lieutenant, in seeking to protect company property in the plant, assaulted the plaintiff in attempting to apprehend another man discovered stealing property, cannot as a matter of law, be said to have been acting in the capacity of a public official."

Counsel for defendant urges that the case of *N. Y., Chicago & St. Louis Rd. Co.* v. *Fieback,* 87 Ohio St., 254, 100 N. E., 889, 43 L. R. A. (N. S.), 1164, is in

point and controlling in the instant case. In that case the Supreme Court held that in situations similar to this the public official although employed by the defendant will be presumed to have been performing the acts complained of in his capacity as such officer, until such presumption is overcome by sufficient evidence, and that such acts must be shown to be outside the public duties of the officer and be either authorized or ratified by the defendant.

We appreciate the law laid down in the *Fieback case*. We approach this appeal fully realizing that the presumption is that the officer was acting in his official capacity unless and until such presumption is overcome by the preponderence of the evidence. The trial court recognized this principle as law and followed it and so instructed the jury. Where we disagree with counsel for defendant is that the facts in the instant case present an entirely different situation than those presented in the *Fieback case*. In the *Fieback case* the Supreme Court said on page 265 that, starting with a clear presumption the officer was acting officially and in line of his duty, it was incumbent upon the plaintiff to affirmatively show the officer was not so acting. And then this statement follows:

"In the present case, *there is no testimony whatever* that any person competent to act for the railroad company, authorized or directed Beattie to in any way interfere with the defendant in error; and the circumstances as well as the testimony of all the witnesses are consistent with Beattie's own claim that he was acting as an officer of the law." (Emphasis ours.)

That is not the situation in the instant case. There is ample evidence in the record to support the finding of the jury that Mays was not acting as a public official in the discharge of a public duty when he shot

the decedent. It is true the testimony is conflicting but the jury had a right to believe those witnesses who testified that, so far as Mays interfered with the decedent in his endeavor to take his wife home, such interference was not only unofficial but outside the conduct of any public official. And then it must not be forgotten that the defendant himself testified as to the orders he gave Mays at the time he employed him and, although both he and Mays claim no control was exerted after the appointment of Mays as a deputy sheriff, there is sufficient evidence to indicate that the relationship, the purpose of the employment of Mays, the duties, and his services to the defendant never changed.

From what has been said it must clearly appear that this case resolves itself into a simple question. Was Mays acting as a public official in the discharge of a public duty, or as an employee and agent of the defendant and in the course of his employment, or in the dual capacity of both? It must further appear that the answer to this question is one of fact to be determined only by the jury from the evidence and the law given it by the court.

It seems conclusive to this court that the pleadings in the instant case presented a justiciable issue and that this was in nowise changed by the opening statement of counsel for plaintiff. The evidence in this case is conflicting but there is sufficient evidence to substantiate the verdict of the jury if believed by it; and, by the verdict, it is clearly shown that any presumption that Mays was acting only as a public officer performing a public duty was overcome by the preponderance of the evidence.

There remains the assignment that the defendant is entitled to a judgment notwithstanding the verdict.

This assignment is predicated upon the answers given by the jury to interrogatories propounded by the defendant. Those given and answered read:

No. 1: "Did Willard Mays arrest Golden E. Estep shortly before Estep was shot? Ans.: Yes."

No. 4: "Why did Willard Mays shoot Golden E. Estep? Ans.: No apparent reason."

No. 7.: "Why was Golden E. Estep at the Ritzy Ray the night he was shot? Ans.: Looking for his wife."

No. 8.: "If you find that Mays was performing a duty for D. E. Corn when he shot Estep, state what duty he was then performing for Corn. Ans.: To quell a disturbance."

It is contended by defendant that in answering interrogatory number eight as above set out the jury specifically found that Mays in quelling a disturbance was acting in his official capacity as a public officer. It must not be overlooked that the defendant testified that when he employed Mays it was one of the specific duties of Mays to take care of trouble, to take care of anything that would not be right in the place of business, to eliminate fussing and quarreling, or in other words to quell disturbances. It is true that both the defendant and Mays claim that no such instructions were ever given after Mays was deputized as an officer but his duties never changed. The jury had been properly instructed and knew that the important question under those instructions was whether Mays was acting as a public officer or as an agent and employee of the defendant at the time of the shooting of the decedent. The fact that the jury found that Mays was quelling a disturbance does not bear out defendant's contention that this is inconsistent with the verdict, but on the other hand, in the opinion of this court, substantiates the verdict rendered. The answer to this question

.must be considered in the light of the duties Mays was hired to perform. The place of business of the defendant cannot be likened to those in the reported cases cited by counsel for the defendant wherein the property to be protected is tangible. This defendant was operating a place of business where crowds congregated, orderly and disorderly, where beer and intoxicating liquors were sold and consumed on the premises and where disturbances by the crowd or members thereof were likely to be nightly occurrences. Can it be said that Mays was not protecting, conserving and furthering the property and business of the defendant when he quelled such disturbances? That was the very purpose of the employment of Mays. Both the good name and the preservation of the tangible property of the defendant, when operating such a business, must of necessity be under the protection of those who see to it that disturbances are not permitted. Therefore, it may well have been the conclusion of the jury that Mays in quelling whatever disturbance occurred between the decedent and decedent's wife was acting not exclusively in his public capacity as an officer but acting either solely as the agent of the defendant or jointly as a public officer and the agent of the defendant which in either event makes the defendant liable. This was one of the main questions for the jury to determine and the court correctly and fully so instructed the jury. Counsel for defendant has within the last few days cited the case of *Masters* v. *N. Y. Cent. Rd. Co.*, 147 Ohio St., 293, 70 N. E. (2d), 898, contending that this case is applicable to the answer given to interrogatory number four. In the *Masters case* the Supreme Court holds that in the event the jury finds the defendant guilty of negligence, the jury is required, upon the proper interrogatory, to specify the act or acts of negligence,

and the failure or inability of the jury to find the existence of a claimed act of negligence in such interrogatory is equivalent to finding against the party having the burden to establish the negligence. Without a prolonged discussion of the *Masters case* a reading of it reveals that the answer given by the jury eliminated all but two of the acts of negligence charged in the petition. This brought the *Masters case* within the consideration of whether the plaintiff was guilty of contributory negligence directly contributing to the cause of his injury or whether he assumed the risk, or both. A different situation exists by reason of the answer given to interrogatory number four in the instant case. Here the jury was asked ''Why did Willard Mays shoot Golden E. Estep'' and the jury answered ''No apparent reason.'' It seems to this court that the only interpretation that can be placed upon that answer is that Mays had no reason to shoot the decedent, which answer is not only in line with the allegations of the amended petition but is supported by the evidence. It certainly eliminates once and for all the defendant's defense that Mays was acting in self-defense. There is no inconsistency in the answers given to the interrogatories with that of the general verdict.

While not made an assignment of error, counsel for defendant in oral argument and through subsequent citations claims prejudicial error by reason of the court refusing to give certain special instructions proffered by the defendant before argument and in the giving of special instructions on behalf of the plaintiff. While it is not incumbent upon this court to pass upon any question not assigned as error, we have carefully examined the special charges requested and refused on behalf of the defendant and those given on behalf of the plaintiff and we find no prejudicial error

in the ruling of the court relative thereto. A casual reading of those special instructions offered by the defendant before argument and refused will reveal that they are not complete within themselves on the particular point of law attempted to be stressed, but that on the other hand they are more in the form of a suggestion that the court itself prepare and give certain special instructions before argument based upon various holdings of the Supreme Court. This, of course, the court should not have been called upon to do at that stage of the proceedings and the same were rightly rejected.

In this connection it may not be amiss to say that we have carefully read the general charge of the court and find it to be clear, correct and concise, covering each issue presented by the pleadings and the evidence. So, it cannot be said that the jury was not in a position to determine by its verdict the issues joined, which under the law it was bound to do in the instant case. There is no question raised as to the amount of the verdict.

The issues presented in this case being solely for the jury, the evidence being conflicting on each material point to such a degree that it cannot be said that reasonable minds must reach the same conclusion, and there being sufficient creditable testimony to support the verdict of the jury, neither the trial court on the motions offered nor this court on review, under such circumstances, can disturb the verdict and judgment.

Finding no error prejudicial to the defendant the judgment must be affirmed.

*Judgment affirmed.*

GILLEN and McCURDY, JJ., concur.